# Smith *v.* Baltimore & Ohio Railroad Company, Appellant.

*Carriers—Common carriers—Negligence—Diversion from proper course of transit—Flood.*

1. In an action against a railroad company to recover for the loss of several carloads of grain by a flood, an averment in the statement of claim that the cars were diverted from the usual and proper course of transit by placing them in a yard particularly named, is not borne out by the proofs where the undisputed evidence is that for seven years prior to the flood all consignments of grain for delivery at the city in question, unless specially consigned to consignees who had private sidings, had been placed in the yard particularly designated for inspection and re-consignment, that this usage was well understood and acquiesced in, and that the plaintiff knew of it and expected the cars to be placed there.

2. In an action against a railroad company to recover for carloads of grain lost in a flood, the case is for the jury where the evidence shows

that the cars were stored in a yard near a river, that as the flood came on the yard master relied on predictions of the weather bureau and the manager of a river coal company that the flood would not be beyond a certain height, while he knew that floods of a much greater height had taken place four times in five preceding years.

Argued Oct. 21, 1908. Appeal, No. 115, Oct. T., 1908, by defendant, from judgment of C. P. No. 4, Allegheny Co., Third Term, 1907, No. 56, on verdict for plaintiffs in case of J. W. Smith et. al., trading as J. W. Smith & Company, v. Baltimore & Ohio Railroad Company. Before MITCHELL, C. J., FELL, BROWN, MESTREZAT, POTTER, ELKIN and STEWART, JJ. Affirmed.

Trespass to recover damages for the loss of four carloads of oats. Before COHEN, J.

The facts are stated in the opinion of the Supreme Court.

The court charged in part as follows:

[Now, anything that I may say to you, gentlemen of the jury, concerning what the witnesses have said, you are not to take as positive. I may make a mistake in telling you that such-and-such a witness said such-and-such a thing. The testimony is entirely for you, and while I am reviewing it, should I be wrong, it is for you to ultimately decide what that testimony is.

Out of the mouth of the plaintiffs' own witness, Mr. Guyton, you have heard a reason why the goods were not shipped to Pittsburg. He tells you that for years his firm had been in the habit of receiving goods shipped over this road from Chicago, at the South avenue yards in Allegheny City. Now, if goods are shipped to me from New York to Pittsburg, via the Pennsylvania Railroad Company, and I agree with the Pennsylvania Railroad Company to receive those goods at Altoona, that is a good delivery. It does not matter whether there was a custom in this case, or whether there was not a custom; although I may say to you that it is my opinion (and you are not bound to take my opinion of the testimony, but only on law), from the testimony, that there was a custom between the grain men of the city of Pittsburg, one of whom was this plaintiff, and the Balti-

more & Ohio Railroad Company to receive freight at the South avenue yards.

But suppose there was no custom; is there anything in this case to show consent, on the part of the plaintiffs, to take their freight from the Baltimore & Ohio road, shipped to Pittsburg, at Allegheny City? I think the testimony shows there was. Out of the mouths of the plaintiffs' own witnesses, it has been established to my satisfaction that they had a long-existing, continued, reasonable habit or custom of receiving their goods from the Baltimore & Ohio Railroad Company at Allegheny City. So that, gentlemen of the jury, there are only two questions in this case, to my mind, for you to determine when you retire to the jury room. One is: Were the goods properly and legally delivered in Allegheny City?] [1]

Plaintiffs presented this point:

2. If the jury find from the evidence that the defendant company contracted to deliver four cars of oats in question to the plaintiffs at Pittsburg, Pa., and failed to so deliver the same, the burden is upon the defendant company to relieve itself from liability. *Answer:* Affirmed as to why goods were not delivered at Pittsburg and why possession was not delivered at Allegheny. [2]

Defendant presented this point:

3. The uncontradicted evidence in this case shows that for the last six or seven years all consignments of grain delivered to the Baltimore & Ohio Railroad Company for carriage and delivery to persons at Pittsburg (except when specifically consigned to consignees having private sidings), were placed in the South avenue yards of the Baltimore & Ohio Railroad Company, in Allegheny, where the same could be inspected, and were there delivered direct to, or reconsigned by, the consignees, and that said usage of the defendant was acquiesced in and at least impliedly assented to by the plaintiffs in this case, and there is no evidence in this case that would warrant the jury in finding that defendant is liable for the damage caused by the flood to the grain in question here, merely because the defendant placed the cars in question in the said South avenue yards. *Answer:* That point is affirmed. The mere fact that they put

the cars in South avenue yards, that by itself is no reason why the plaintiffs should recover in this case, if you believe the testimony as to the usage existing between the plaintiffs and defendant as to the place of delivery of the freight shipped from Chicago. [3]

Plaintiffs also presented this point:

7. It appearing from the testimony of Mr. Edward Donnelly, a conductor on duty in the Allegheny yards of the defendant company, and a witness for the defendant, that orders had been issued on the evening of March 13, 1907, to remove all perishable stuff from the South avenue yards to high ground, and from the evidence of C. A. Smith, a conductor on duty in the defendant company's yards, and a witness for the defendant, that about 6:30 in the evening of March 13, 1907, orders had been issued to remove cars from the South avenue yards to higher ground; taking this evidence in connection with the testimony of Samuel McElroy and others, to the effect that it would have been possible to have removed perishable freight from the South avenue yards to a place of safety had the effort been made before midnight on March 13, 1907, and the defendant company having failed to remove cars to a place of safety, the defendant is liable, and the verdict must be for the plaintiffs. *Answer*: Affirmed, with the qualification that defendant had a right to reasonably marshal its forces in behalf of saving their entire freight along the entire line affected in the immediate vicinity; especially had they a right to protect the freight at points where greater danger existed by reason of lower trackage along the line. [7]

Verdict and judgment for plaintiffs for $2,712.96. Defendant appealed.

*Errors assigned* were (1, 2, 3, 7) above instructions, quoting them.

*John S. Wendt*, with him *Johns McCleave*, for appellant.— The court erred in submitting to the jury the question whether the cars in question were properly or legally placed in the South avenue yard in Allegheny City, and in not unequivocally in-

structing the jury that the defendant was not negligent or guilty of any breach of duty to the plaintiffs in placing the cars in said yard: Packard v. Earle, 113 Mass. 280; Reiss v. Ry. Co., 98 Fed. Repr. 533; Marande v. Ry. Co., 184 U. S. 173 (22 Sup. Ct. Repr. 340); McMasters v. R. R. Co., 69 Pa. 374; Hostetter v. Park, 137 U. S. 30 (11 Sup. Ct. Repr. 1); Pierce v. Southern Pac. Co., 120 Cal. 156; s. c., 40 L. R. A. 350 (47 Pac. Repr. 874).

It being admitted in this case that the damage complained of was caused by a flood, the burden rested upon the plaintiffs to show that the proximate inducing cause of the injury was the negligence of the defendant; the plaintiffs failed to sustain this burden: Cau v. Texas & Pacific Ry. Co., 194 U. S. 427 (24 Sup. Ct. Repr. 663); Arthur v. Ry. Co., 204 U. S. 505; Morse v. Ry. Co., 53 Atl. Repr. 874; Long v. R. R. Co., 147 Pa. 343; Farnham v. Camden & Amboy R. R. Co., 55 Pa. 53; Patterson v. Clyde, 67 Pa. 500; Buck v. Penna. R. R. Co., 150 Pa. 170; Frank Bros. & Co. v. Railroad Co., 9 Pa. Superior Ct. 129.

*Robert M. Ewing,* with him *Arthur C. Smith* and *D. A. Rowland,* for appellees.

OPINION BY MR. JUSTICE FELL, January 4, 1909:

This was an action to recover damages for the loss of four carloads of grain delivered to the defendant at Chicago for carriage to Pittsburg. The cars were not taken into Pittsburg but were placed in the defendant's hay and grain yard on the opposite side of the Allegheny river, at South avenue, Allegheny City. While the cars were in this yard awaiting delivery to the plaintiff, there was a flood in the river, the yard was overflowed and the grain was injured. It was averred in the statement of claim that the cars were diverted from the usual and proper course of transit by placing them in the South avenue yard instead of carrying them to the defendant's yard in Pittsburg, and that the defendant was afterwards negligent in not removing the cars to a place of safety.

In support of the assignments of error it has been earnestly argued (1) that there was no breach of duty in placing the cars

in the South avenue yard and that the jury should have been so instructed; (2) that there was no evidence to warrant a finding of negligence on the part of the defendant in not removing the cars, that caused or contributed to the injury complained of.

It was specified in the bill of lading that the grain should be carried to "the usual place of delivery at said destination." Pittsburg and Allegheny, although distinct municipalities separated by a river, were commercially one community. The undisputed evidence was that for seven years prior to the flood all consignments of grain for delivery at Pittsburg, unless specially consigned to consignees who had private sidings, had been placed in the South avenue yard for inspection and reconsignment; that this usage was well understood and acquiesced in; that the plaintiff knew of it and expected the cars to be placed there.

Since there was practically no dispute as to this matter, at the close of the testimony there might have been a distinct instruction withdrawing the question of diversion from the jury. This would have cleared the atmosphere at the trial, and confined and directed the attention of the jury to the only question remaining, that of negligence. It is argued that it was neither distinctly withdrawn nor distinctly submitted, and that the verdict may have been based upon a finding as to it, unsupported by competent evidence. It was in effect withdrawn by the charge, in which the learned trial judge stated that the custom of delivering at the South avenue yard had been established to his satisfaction by the plaintiffs' witnesses, that this was a delivery within the meaning of the law because agreed to by the parties, and that the only question remaining was as to negligence. The jury must have understood from this instruction that the question of diversion was eliminated.

The main contention of the defendant was that the flood was extraordinary and unprecedented, and that adequate measures had been taken to guard against any danger that could reasonably have been anticipated. The cars were placed in the yard at different times on March 13, 1907. There was then a flood in the river, and at places the defendant's tracks were covered

with water. A rise of thirty feet would put water in the bottom of the freight cars in the yard. The water rose constantly all day, and at 5 P.M. the yard master had information that the water would rise twenty-six or twenty-eight feet and possibly higher, and he provided for a rise of thirty feet. At 2 A.M. on the fourteenth the water had risen a height of twenty-eight feet and was still rising. An attempt was then made to move the cars, but it was unsuccessful because logs and rafts had been washed on the tracks and the cars were derailed by them. The yard master relied for information on the local forecaster of the weather bureau and the manager of a river coal company, whose experience and knowledge gave weight to his opinion. These were probably the best authorities available. The yard master relied upon them implicitly and went to his home at five o'clock on the thirteenth and his assistant left at nine o'clock.

The assistant yard master testified: "The water was rising rapidly; we expected it at any moment to shut us out. The warning we got was that we would get from twenty-six to twenty-eight feet. That was all the warning we got except they said of course it may go higher. This is the information they gave; and we didn't go on what 'may be.'" A witness called by the defendant, who for twenty-seven years had been the manager of steel works a quarter of a mile below the defendant's yard, testified that he had received information from the weather bureau and the river coal company at five o'clock on the thirteenth that the rise of water would not exceed twenty-seven feet; but that the forecast was so at variance with the actual conditions, there having been a heavy snowfall and continuous rain and a rapid rise of the river, that he did not believe it correct and protected his property against a rise of thirty-two feet during the night and thirty-four feet the next morning.

The defendant's employees were not required to guard against a rise of water not reasonably to be expected. But they knew that floods in which the river rose over twenty-eight feet were not unusual. It had been above that height four times in the five preceding years, and within that period had reached a height of 32.4 feet. They knew that during the

day there had been a continuous and rapid rise of the river. Whether with this knowledge they were negligent in placing implicit reliance on the reports received from the weather bureau and the river coal company and in not removing the cars to higher ground, was a question not to be withdrawn from the jury.

The judgment is affirmed.